**NOT FOR CITATION**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

FOSTER SHANE GAINES,

               Petitioner,

     v.

A.K. SCRIBNER, Warden,

               Respondent.

_____/

No. C 03-1268 PJH (PR)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING PETITIONER'S MOTION FOR ENTRY OF DEFAULT JUDGMENT**

(Docket no. 17)

This is a habeas corpus case filed pro se by a state prisoner pursuant to 28 U.S.C. § 2254.  In response to the court's Order to Show Cause respondent has filed an answer and a memorandum of points and authorities in support of it, and has lodged supporting exhibits.  Petitioner has responded with a traverse.[1]  The case is ready for decision.

## BACKGROUND

The California Court of Appeal summarized the underlying facts as follows:[2]

> In May 1999, the victims, Orion Washington, and Joseph Tupou lived in a two-story residence on East 32nd Street in Oakland.  Also residing in the building were Joseph's brother, William Tupou, William's wife or mate, Bahati Hildreth, their two children, Hildreth's mother, and grandmother.  On May 23, 1999, a dispute arose between appellant and Washington, when Washington repaid a neighbor $20, on appellant's behalf, and appellant refused to reimburse him.  The dispute apparently ended when Washington threw a bottle at appellant's green Chrysler Le Baron, and appellant drove off.

> At about 9 p.m., Washington went to check on his barking dogs.  Joseph joined Washington, William, and a man named Roy or "Peanut" on the front porch.  Appellant drove up and told Washington he was still angry

[1]After filing his traverse, petitioner moved for the entry of default judgment on the ground that he had not received notice that respondent had complied with the Court's order granting an extension of time to file an answer to the petition.  The motion is without merit; the order deemed the already-filed answer timely.  Petitioner responded to the answer with a traverse.  Accordingly, the motion is denied.  (Docket no. 17.)

[2]The footnotes from the opinion have been renumbered.

**United States District Court**

For the Northern District of California

about Washington throwing a bottle at his car, and they exchanged words. According to Washington, appellant got out of the car with something in his hand that was covered by a cloth. Washington knew it was a gun and turned and ran. Washington heard shots as he ran away around the side of the house. Washington entered the house through the back door, and started up an interior staircase near the front door. Appellant entered the front door just as Washington was running up the stairs. He fired three shots, and hit Washington in the left leg behind the knee. Washington dragged himself up the stairs and into a bedroom occupied by Hildreth and her two small children.

Meanwhile, Joseph had been hit by the first shots. He was shot in the back of his leg and fell face down on the porch. As he lay there he heard footsteps enter the house, then heard two or three more shots inside, and heard the shooter leave and drive off in the car. Joseph testified that he never saw who shot him, and denied knowing appellant. Joseph did see that the person who got out of the car was Black and had braids.

Hildreth was upstairs putting her children to bed.[3] She saw appellant get out of his green Le Baron, holding a gun, and walk toward the house. She heard glass breaking, and when she started down the stairs, she saw Washington running towards the stairs. Hildreth saw appellant fire the gun at least twice. Her testimony was contradictory on whether she actually saw appellant shoot Washington. Initially she testified she went to check on her kids, after the first two shots, hid in the closet, and then heard two more shots. She saw that Washington was wounded when she came out. Later, on cross-examination she said she actually saw Washington get shot. She did not say, in her statement to the police, that she had seen Washington get shot.

Someone called 911, and the police and paramedics arrived in approximately four minutes. Washington told the police that appellant had shot him. He described appellant as being Black, in his 20's, with braided hair, and 6 gold caps worn on his canine incisors. Washington was taken to the hospital for surgery where he remained for the next five days. He refused to give a statement to the police while he was there. Washington was concerned for his safety while in the hospital, and had registered under an alias. On May 27, 1999, Washington told hospital personnel that he had seen someone who looked like his assailant walking in a hallway, and asked to be moved to another room. One of Washington's godsisters and his girlfriend also said they had seen a friend of appellant's in the hospital.

A few days after the shooting, Sergeant Larson interviewed Joseph Tupou. Tupou was reluctant to discuss the shooting because he feared retaliation. Larson showed Tupou a photographic lineup that included appellant's photograph. He appeared to look closely at appellant's photograph but declined to identify anyone. Hildreth, however, identified appellant.

After he was released from the hospital, Washington met Sergeant Larson at the police station, and identified appellant in the photographic

---

[3]   Hildreth could not be located at the time of trial, and the court declared her unavailable to testify. Her preliminary hearing testimony was read into the record.

2

United States District Court

For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

lineup.  A warrant issued for appellant's arrest, and upon learning that appellant had gone to Reno, Nevada, Sergeant Larson contacted the police there.  He gave a false name when arrested, and had another warrant for driving under the influence.

Washington again identified appellant as his assailant, at trial.  He testified that he continued to fear for his safety and had moved out of the apartment building where the shooting had occurred.

Appellant testified that he was in Reno, Nevada at the time of the shooting.  He testified that he supported himself as a drug dealer, and that the apartment building where Washington and Hildreth lived was a drug house.  Appellant supplied Washington with drugs, and Washington repaid him out of the sale proceeds.  Shortly before appellant was arrested for driving under the influence, appellant cut off Washington's supply because Washington had failed to repay appellant, and Washington was angry about this.  Appellant also believed Hildreth did not like him, because he took her husband or mate, William, out to see other women.  Around the time of his arrest, appellant decided to move to Nevada, and work with a friend named Miguel Ollier.  Appellant, his girlfriend Roshawn Wade, and Miguel Ollier, all testified that appellant moved to Reno on May 18, 1999.  Appellant stayed in Reno until his arrest in this case.  Ollier visited with appellant daily including on May 23, and Wade also was with appellant in Reno on May 23, 1999.

When appellant was arrested in Reno, he gave a false name because he did not want to be taken in on his outstanding warrant for driving under the influence.  He was shocked when he learned he was also wanted for assault upon Washington and Tupou.

Respondent's Ex. C (Unpublished Opinion of the California Court of Appeal, First Appellate District, *People v. Gaines*, No. A090901 (July 25, 2001)) at 1-4.[4]

In 2000, an Alameda County jury convicted petitioner of two counts of assault with a firearm, with findings that he personally used a firearm and inflicted great bodily injury during the crime.  He was sentenced to thirteen years and four months in state prison.  The California Court of Appeal affirmed petitioner's conviction in a reasoned opinion, and issued a separate summary denial of his petition for writ of habeas corpus.  The California Supreme Court denied review of the same claims raised in the present petition.

In his federal habeas corpus petition petitioner claims that (1) his right to confront the witnesses against him was violated when the trial court found that the prosecution had exercised due diligence in attempting to locate Hildreth, and allowed her preliminary

_____

[4] All exhibits referenced in this order are those lodged by respondent in support of the answer to the petition, unless otherwise noted.

3

United States District Court

For the Northern District of California

1  hearing testimony to be read at trial; (2) the prosecutor unlawfully suppressed evidence

2  which undermined its showing of due diligence; (3) defense counsel was ineffective for

3  failing to discover the documents the prosecution allegedly suppressed; (4) the trial court

4  improperly instructed the jury regarding Hildreth's preliminary hearing testimony; (5) the trial

5  court improperly instructed the jury regarding evidence of petitioner's efforts to suppress

6  evidence; and (6) counsel was ineffective for failing to object to the prosecutor's closing

7  argument.

## STANDARD OF REVIEW

9  A district court may not grant a petition challenging a state conviction or sentence on

10  the basis of a claim that was reviewed on the merits in state court unless the state court's

11  adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an

12  unreasonable application of, clearly established Federal law, as determined by the

13  Supreme Court of the United States; or (2) resulted in a decision that was based on an

14  unreasonable determination of the facts in light of the evidence presented in the State court

15  proceeding."  28 U.S.C. § 2254(d).

16  A state court decision is "contrary to" Supreme Court authority, that is, falls under

17  the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to

18  that reached by [the Supreme] Court on a question of law or if the state court decides a

19  case differently than [the Supreme] Court has on a set of materially indistinguishable facts."

20  *Williams (Terry) v. Taylor*, 529 U.S. 362, 412-13 (2001).  A state court decision is an

21  "unreasonable application of" Supreme Court authority, falling under the second clause of §

22  2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's

23  decisions but "unreasonably applies that principle to the facts of the prisoner's case."  *Id.* at

24  413.  The federal court on habeas review may not issue the writ "simply because that court

25  concludes in its independent judgment that the relevant state-court decision applied clearly

26  established federal law erroneously or incorrectly."  *Id.* at 411.  Rather, the application must

27  be "objectively unreasonable" to support granting the writ.  *Id.* at 409.

28  Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual

4

**United States District Court**
For the Northern District of California

1   determination will not be overturned on factual grounds unless objectively unreasonable in

2   light of the evidence presented in the state-court proceeding." *Miller-El v. Cockrell*, 537

3   U.S. 322, 340 (2003); *see also Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000).

4   Section 2254(d)(2) applies to intrinsic review of a state court's process, or situations in

5   which the petitioner challenges the state court's findings based entirely on the state court

6   record.  *Taylor v. Maddox*, 366 F.3d 992, 999-1000 (9th Cir. 2004).  When a petitioner

7   challenges a state court's findings with respect to evidence extrinsic to the record, a district

8   court must presume correct the state court's factual determination unless the petitioner

9   rebuts the presumption of correctness by clear and convincing evidence.  28 U.S.C.

10  § 2254(e)(1).  Conclusory assertions will not do.  *Id.*

11  The state court decision to which 2254(d) applies is the "last reasoned decision" of

12  the state court, *see Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991); *Barker v. Fleming*,

13  423 F.3d 1085, 1091-92 (9th Cir. 2005).  When there is no reasoned opinion from the

14  highest state court to consider the petitioner's claim, a federal court looks to the last

15  reasoned opinion of a lower court.  *See Ylst*, 501 U.S. at 801–06.  However, when the state

16  court gives no reasoned explanation of its decision and there is no reasoned lower court

17  decision on the claim, a review of the record is the only means of deciding whether the

18  state court's decision was objectively reasonable.  *See Himes v. Thompson*, 336 F.3d 848,

19  853 (9th Cir. 2003).  When confronted with such a decision, a federal court should conduct

20  "an independent review of the record" to determine whether the state court's decision was

21  an unreasonable application of clearly established federal law.  *Id.*

22  If constitutional error is found, habeas relief is warranted only if the error had a

23  "'substantial and injurious effect or influence in determining the jury's verdict.'"  *Penry v.*

24  *Johnson*, 532 U.S. 782, 795 (2001) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 638

25  (1993)).

26  //

27  //

28  **DISCUSSION**

**United States District Court**

For the Northern District of California

*A.     The Admission of Hildreth's Preliminary Hearing Testimony*

*1.     Background*

Petitioner claims that the trial court violated his right to confrontation when it admitted Hildreth's preliminary hearing testimony at trial, after finding that she was unavailable and that the prosecution had exercised due diligence in attempting to locate her.

The California Court of Appeal summarized the relevant facts developed at the due diligence hearing as follows:

> Hildreth testified at the preliminary hearing in August 1999.  The information was filed on September 1, 1999, and appellant entered a time waiver on September 23, 1999.  The trial date, originally was set for January 18, 2000, but on that day it was reset for February 22, 2000.  On January 27, 2000, appellant withdrew his time waiver.  At that point the prosecutor informed his investigator, Clyde Sims, that the case took priority.  On February 23, the trial court heard pretrial motions, and voir dire took place for the next two days.  For reasons not explained in the record the case was then in recess until March 6, 2000.

> On March 7, the prosecutor moved to admit Hildreth's preliminary hearing testimony.  Clyde Sims, testified that, on or about February 22, the date trial was scheduled to begin, he attempted to contact Hildreth at her last known address, 1373 East 32nd Street, but she was not there, and the house was boarded up.  Sims was able to contact Washington and Tupou, who had lived in the same building, and they informed him that Hildreth had moved out of town, but they did not know where.  Sims also ran her name through the DMV, "corpus," and state criminal information networks.  He found and checked a second address on East 32nd street, but to no avail.  He ran another computer check using a national search engine and found another address on 86th Avenue.  When he went to that address he learned from another resident that Hildreth had not lived there for about three months.  Sims contacted family support, and learned that Hildreth's mother was still listed as living on 32nd street, but found another address for her on Meldon Street through the DMV computer.  He went to that address and was informed by Fanny Eagle, a cousin of Hildreth's, that she had moved to Modesto.  He left a card with Eagle and asked her to have Hildreth or her mother contact him.

> Sims contacted the Modesto police department, and asked if they had any accident or police reports filed by Hildreth.  He also had a paralegal check the Stanislaus County District Attorney's files, and found nothing.  He did have a lead that she was living with an unnamed boyfriend in Modesto, but after contacting various police departments found nothing further.

> Sims also ran a computer check of filed lawsuits and found Hildreth had filed a paternity suit some time ago.  When he learned that William Tupou was the likely father, and that William lived with Joseph, he tried to contact William, by leaving several cards with Joseph, urging Joseph to have William

United States District Court

For the Northern District of California

1  contact him, but William did not respond.  The last visit to Joseph was the day
2  before the hearing on Hildreth's unavailability, and Sims explained why it was
   urgent that William contact Sims, but Joseph was unable to persuade William
3  to do so.

Ex. C at 4-5.

At the conclusion of the presentation of evidence at the due diligence hearing,

petitioner argued that due diligence had not been shown because the district attorney's

office had not stayed in touch with Hildreth between the date of the preliminary hearing in

August 1999 and the trial date six months later, and did not start looking for Hildreth until

the trial date.  RT 187.  Petitioner also submitted to the court the question whether the

efforts made by the prosecution since then to locate Hildreth were diligent.  *Id.*  The trial

court then ruled as follows:

> The court will find that there have been reasonable efforts made.  What
> happens here is the standard appears to be reasonable diligence, not
> extraordinary diligence.  And given the situation, I think it would be
> unreasonable to require that the prosecution keeps track of all of their
> witnesses over a six or eight month period of time, particularly in light of the
> fact that I've heard no evidence that this was a witness that they thought they
> had any problem with getting in.  So the court finds that inspector Sims' efforts
> to locate Bahati Hildreth were reasonable and were very diligent, and the
> court will then allow her to be declared an unavailable witness pursuant to
> Evidence Code section 240(A)(5).

RT 190.

On appeal, petitioner argued that the prosecution's efforts to locate Hildreth were not

diligent because they commenced so late, and because the prosecution had not asked

Hildreth, when she was present at the preliminary hearing, to contact the district attorney's

office if she moved.  Resp. Ex. A (Appellant's Opening Brief) at 16-20.  The court of appeal

analyzed petitioner's claim in accord with state law cases which interpreted the term "due

diligence" as connoting "persevering application, untiring efforts in good earnest, efforts of

a substantial character."  Ex. C at 6.  As such, relevant considerations include "whether the

search was timely begun, the importance of the witness's testimony, and whether leads are

competently explored."  *Id.* (internal quotation marks, brackets and citation omitted).

The court of appeal first noted that petitioner was not challenging the sufficiency of

the prosecution's efforts to secure Hildreth's attendance once those efforts began.  *Id.*  With

7

respect to petitioner's argument that there was no due diligence because the search for

Hildreth did not start until trial began, the court of appeal relied on state law to find that no

such *per se* rule existed. Ex. C at 6-7. Rather, whether the search had "timely begun"

included consideration of other relevant factors such as whether the prosecution had

grounds for believing it would encounter difficulty in securing the witness's presence;

whether there were grounds for inferring that, had efforts commenced sooner, the

prosecution would have been able to secure the witness's attendance; the likelihood that

trial would actually commence on the date set for trial; when the witness's testimony likely

would be needed; and the importance of the witness. Ex. C at 7. Applying these factors,

the court of appeal made the following findings:

> In this case, there was no potentially dispositive motion pending, but
> there was uncertainty about the trial date until the time waiver was formally
> withdrawn in late January 2000. Although it is undisputed that the actual
> search for Hildreth did not commence until the date set for trial, there was no
> evidence that she had been uncooperative, or reluctant to testify. Moreover,
> although the trial had begun when Sims initiated the search, there was a
> recess of approximately 10 days before any prosecution witnesses were
> presented during which the prosecution exhaustively followed every lead.
> Also, although Hildreth's testimony provided important corroboration of
> Washington's testimony, her testimony was not critical to the prosecution's
> case, because Washington could, and did identify appellant as his assailant,
> and that identification was also partially corroborated by Joseph Tupou's
> description of a Black man with braids. We conclude that the search was
> timely begun, and that once initiated the prosecution exhausted all possible
> leads.

Ex. C at 8 (footnote omitted).

The court also found that, with respect to petitioner's argument that the prosecution

did not exercise due diligence because it did not ask Hildreth to inform the district attorney's

office of any new address, there was no evidence in the record to support petitioner's

assertion that the district attorney did not make such a request. Ex. C at 9 n.5. The court of

appeal thus concluded that the trial court had not erred in finding that the prosecution

exercised reasonable diligence and in admitting Hildreth's preliminary hearing testimony.

Ex. C at 8-9.

In his petition for review to the California Supreme Court, petitioner reiterated the

**United States District Court**
For the Northern District of California

1  arguments made below, and also argued that the prosecution had failed to exercise due

2  diligence by not exhausting obvious leads (such as contacting the telephone company to

3  find Hildreth's phone number because it was known that she had been in touch with William

4  Tupou by phone, making further efforts to locate William, and making further attempts to

5  locate Hildreth's mother), and by conducting a search that lacked in "substantial character"

6  (because, for example, it focused heavily on trying to locate Hildreth through law

7  enforcement records, even though Hildreth did not have a criminal history, failed to contact

8  local and state agencies that might have access to information on the whereabouts of

9  Hildreth's children, failed to access public utility and voter registration information about

10  Hildreth, and pursued duplicative leads).  The California Supreme Court denied the petition

11  summarily.

12      *2.    Applicable Federal Law*

13      The Confrontation Clause of the Sixth Amendment provides that in criminal cases

14  the accused has the right to "be confronted with witnesses against him."  U.S. Const.

15  amend. VI.  The federal confrontation right applies to the states through the Fourteenth

16  Amendment.  *See Pointer v. Texas*, 380 U.S. 400, 403 (1965).  The ultimate goal of the

17  Confrontation Clause is to ensure reliability of evidence, but it is a procedural rather than a

18  substantive guarantee.  *Crawford v. Washington*, 541 U.S. 36, 61 (2004).  It commands,

19  not that evidence be reliable, but that reliability be assessed in a particular manner: by

20  testing in the crucible of cross-examination.  *Id.*; *see Davis v. Alaska*, 415 U.S. 308, 315

21  (1974) (a primary interest secured by the Confrontation Clause is the right of cross-

22  examination).  The Confrontation Clause applies to all out-of-court testimonial statements

23  offered for the truth of the matter asserted, that is, "testimonial hearsay."  *See Crawford*,

24  541 U.S. at 51.

25      Under certain circumstances, the prior testimonial statements of a witness may be

26  admitted at trial when the witness is not available for cross-examination.  When the

27  California Court of Appeal rendered its decision in the present case, the governing standard

28  in such circumstances was that announced in *Ohio v. Roberts*, 448 U.S. 56 (1980), which

United States District Court
For the Northern District of California

1   held that a witness's prior testimony may be admitted so long as the witness is unavailable

2   and the statements have "adequate indicia of reliability," that is, fall within a "firmly rooted

3   hearsay exception" or bear "particularized guarantees of trustworthiness." *Id.* at 66; *see*

4   *California v. Green*, 399 U.S. 149, 165-66 (1970) (where defendant had opportunity to

5   cross examine declarant at preliminary hearing, no Confrontation Clause violation in

6   admitting statements at trial when declarant professed loss of memory).[1]  The government

7   has the burden of showing that the witness is "unavailable."  *See Terrovona v. Kincheloe*,

8   852 F.2d 424, 427 (9th Cir. 1988).  This requires that the prosecutor make a good faith

9   effort to obtain the witness's presence.  *See Barber v. Page*, 390 U.S. 719, 724-25 (1968).

10       *3.    Analysis*

11       Petitioner argues that the admission of Hildreth's preliminary hearing testimony

12   violated his right to confrontation because the prosecutor's attempts to secure her presence

13   at trial were lacking in good faith, as shown by the delayed commencement of the search,

14   the absence of contact with Hildreth between the preliminary hearing and the start of trial,

15   and the failure to exhaust additional leads.

16       The court finds that it was not objectively unreasonable for the state court to

17   conclude that the prosecutor acted with due diligence, and that this determination satisfies

18   the good faith requirement.  Although the prosecutor did not begin his search until the date

19   set for trial, and did not remain in touch with Hildreth between the preliminary hearing and

20   the trial date, there was no evidence that Hildreth had been uncooperative or reluctant to

21   testify at the hearing.  Moreover, there was no reason for the prosecutor to consider her a

22

23       [1]In *Crawford*, decided after petitioner's state claim was exhausted, the Supreme Court
    held that out-of-court testimony may be admitted only where the declarant is unavailable and the
24   opposing party had a prior opportunity for cross-examination.  The Supreme Court recently granted
    certiorari to determine whether *Crawford* satisfies the requirements for retroactive application.  *See*
25   *Bockting v. Bayer*, 399 F.3d 1010 (9th Cir. 2005), *cert. granted sub nom. Whorton v. Bockting*, 126
    S. Ct. 2017 (2006).  However, while *Crawford* clarified that reliability can be established only where
26   there has been a prior opportunity for cross-examination, it did not modify the *Roberts* unavailability
    requirement.  In this case, the issue is whether the witness was unavailable; the opportunity for
27   cross-examination is undisputed.  Thus, the uncertainty  of the pending *Bockting* decision does not
    affect this Court's ability to reach a decision on the merits of petitioner's claim because reliability is
28   not at issue here.

United States District Court

For the Northern District of California

flight risk because she had lived in the same house with her mother and grandmother for many years.  Also, even though trial was set to begin on February 22, there is no indication that Hildreth was going to be called as a witness in the early days of trial; in any event, trial did not actually commence until March 6, which left the prosecutor with several days to attempt to find her.  Importantly, there is nothing in the record developed at trial which suggests that even if the prosecution had begun its search efforts as early as January 18, 2000, the original trial date, Hildreth would have been available to be served by subpoena at that time.

In addition, the efforts made by the prosecution once the search began were sufficiently far reaching to establish good faith.  *See, e.g., Windham v. Merkle*, 163 F.3d 1092, 1102 (9th Cir. 1998) (prosecutor's efforts to locate witness who had appeared at preliminary hearing and said he would testify at trial were made in good faith where prosecutor subpoenaed witness, met with him to discuss proposed testimony, tried to call him three times as trial date approached, contacted his parole officer, had a bench warrant issued for his arrest, and assigned a criminal investigator to locate him).  While petitioner claims that other leads should have been followed, he has provided no information from which it can be inferred that those leads would have been successful.  Although "[o]ne, in hindsight, may always think of other things," *Ohio v. Roberts*, 448 U.S. at 75, the reasonableness of the prosecution's efforts is not judged by its failure to pursue leads which are unlikely to have resulted in locating the witness, *id.* at 76.

Petitioner claims that his inability to cross-examine Hildreth at trial prevented him from receiving a fair trial because of the materiality of her testimony to his case.  He maintains that Washington's identification of him was in doubt, and therefore the prosecution relied heavily on Hildreth's testimony for corroboration of petitioner's identity. He further notes that the jury asked for a readback of Hildreth's prior testimony, and for a copy of her statement to the police.

Although Hildreth was not available for cross-examination at trial, she was extensively cross-examined at the preliminary hearing by petitioner's counsel.  CT 19-57;

**United States District Court**
For the Northern District of California

1   *see California v. Green*, 399 U.S. at 165 (witness's prior testimony at preliminary hearing

2   was admissible because it was given under circumstances closely approximating those at a

3   typical trial).  Also, during closing argument petitioner's counsel emphasized the

4   inconsistencies in her testimony, suggested reasons she might have for lying about

5   petitioner's identity, and argued that her testimony did not in fact corroborate Washington's.

6   RT 400-403.  Moreover, as the court of appeal found, while Hildreth's testimony did provide

7   important corroboration of Washington's testimony, it was not critical to the prosecution's

8   case because Washington identified petitioner as his assailant, and that identification was

9   also partially corroborated by Joseph Tupou's description of the assailant as a black man

10  with braids.

11       For these reasons, the court concludes that the state court's rejection of petitioner's

12  claim was not based on an unreasonable determination of the facts in light of the evidence

13  presented at the state court proceeding, 28 U.S.C. § 2254(d)(2), nor was it contrary to or an

14  unreasonable application of clearly established federal law, *id.* § 2254(d)(1).  Accordingly,

15  this claim for habeas corpus relief is denied.

16  B.   *Suppression of Evidence by the Prosecution*

17       1.   *Background*

18       Petitioner alleges that the prosecution unlawfully suppressed evidence that it knew

19  that Hildreth had moved in August 1999 from the residence where the shooting occurred,

20  far in advance of petitioner's trial.  He maintains that, had this evidence been revealed to

21  the trial court, the prosecution's showing of due diligence, which allowed Hildreth's

22  preliminary hearing testimony to be admitted at trial, would have been undermined.

23       The facts in support of petitioner's claim are detailed in his petition.  Petition at 8-12.

24  In sum, they are that the day after the shooting took place local government agencies

25  working in conjunction with a special unit of the Oakland Police Department determined

26  that the residence where the shooting occurred was in such a state of deterioration and

27  disrepair that it was uninhabitable.  Thus, over the course of the next few months (between

28  late May and mid-August 1999), negotiations between the agencies and the tenants of the

**United States District Court**
For the Northern District of California

building ensued, first in an effort to remedy the problems and then, when it was clear that was not going to happen, in an effort to relocate the tenants before the property was boarded up.  The last meeting with the tenants took place on August 9, 1999.  Ten days later, Hildreth testified at petitioner's preliminary hearing.  On August 24, 1999, the property was boarded up.  On September 1, 1999, and November 16, 1999, a government agent visited the property and found it vacant.  At the time of petitioner's trial in late February and early March 2000 the property was still boarded up and abandoned.

Petitioner asserts that the prosecution, through the government agencies involved, had constructive knowledge about the condemnation of the property and the relocation of the tenants.  Thus, he maintains that the prosecution was required, but failed, to disclose this information to the defense.  He claims that the information was favorable to the defense because it would have undermined the prosecution's showing that its efforts to locate Hildreth were reasonably diligent, insofar as the prosecution knew well before trial that Hildreth could not be found at the residence after it was boarded up in August 1999.  He concludes that if due diligence had not been found by the trial court, Hildreth's preliminary hearing testimony would not have been admitted at trial, and without it there is a reasonable probability that the verdict against him would have been different.

Petitioner raised these assertions for the first time in his state habeas corpus petition, which the court of appeal denied summarily and the California Supreme Court declined to review.  In the present petition, he claims that the prosecution's failure to disclose the information violated his rights under the Fifth and Fourteenth Amendments.

    *2.   Applicable Federal Law*

In *Brady v. Maryland*, 373 U.S. 83 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87.  The Supreme Court has since made clear that the duty to disclose such evidence applies even when there has been no request by the accused, *United States v. Agurs*, 427 U.S. 97, 107 (1976), and that the duty

United States District Court

For the Northern District of California

1  encompasses impeachment evidence as well as exculpatory evidence, *United States v.*

2  *Bagley*, 473 U.S. 667, 676 (1985).  *Brady* has no good faith or inadvertence defense;

3  whether nondisclosure was negligent or by design, it is the responsibility of the prosecutor.

4  *Gantt v. Roe*, 389 F.3d 908, 912 (9th Cir. 2004).  Moreover, the rule encompasses

5  evidence "'known only to police investigators and not to the prosecutor.'"  *Strickler v.*

6  *Greene*, 527 U.S. 263, 281 (1999) (quoting *Kyles v. Whitley,* 514 U.S. 419, 438 (1995)).  In

7  order to comply with *Brady,* therefore, "'the individual prosecutor has a duty to learn of any

8  favorable evidence known to the others acting on the government's behalf in this case,

9  including the police.'"  *Id.* (quoting *Kyles*, 514 U.S. at 437).

10  "'There are three components of a true *Brady* violation: [t]he evidence at issue must

11  be favorable to the accused, either because it is exculpatory, or because it is impeaching;

12  that evidence must have been suppressed by the State, either willfully or inadvertently; and

13  prejudice must have ensued.'"  *Banks v. Dretke,* 540 U.S. 668, 691 (2004) *(*quoting

14  *Strickler*, 527 U.S. at 281-82).  Such evidence is material "'if there is a reasonable

15  probability that, had the evidence been disclosed to the defense, the result of the

16  proceeding would have been different.'"  *Strickler*, 527 U.S. at 280 (quoting *Bagley*, 473

17  U.S. at 682); *see also Kyles,* 514 U.S. at 433-34.  "A 'reasonable probability' is a probability

18  sufficient to undermine confidence in the outcome."  *Bagley*, 473 U.S. at 682.

19      *3.      Analysis*

20      Petitioner argues that the information regarding the condemnation of the property

21  and the relocation of the tenants constitutes *Brady* or *Bagley* material because it would

22  have undermined the prosecution's due diligence showing, which ultimately would have led

23  to the exclusion of Hildreth's preliminary hearing testimony at trial.  However, under clearly

24  established Supreme Court precedent, the evidence must be favorable to the accused

25  "either because it is exculpatory, or because it is impeaching."  *Banks,* 540 U.S. at 691.  In

26  this case, the information contained in the agency reports was neither.  And petitioner has

27  not shown a reasonable probability that the reports would have led to the discovery of such

28  evidence.  *See Downs v. Hoyt*, 232 F.3d 1031, 1037 (9th Cir. 2000) (rejecting as

14

United States District Court

For the Northern District of California

speculative argument that withheld material might have led to some admissible evidence which might have been sufficiently favorable to meet the *Bagley* standard).  Hildreth was, in fact, a witness whose testimony was *inculpatory* to petitioner, and he has cited to nothing in the reports which could have been used as evidence to impeach her.  Even though it might have been favorable to petitioner to have Hildreth on the stand so that the jury could assess her credibility firsthand, because the reports did not contain exculpatory or impeachment evidence the prosecution was under no constitutional obligation to provide them to petitioner.  *See Gray v. Netherland*, 518 U.S. 152, 168 (1996).

Moreover, even if the court assumes, *arguendo*, that the information in the reports was favorable under *Brady* or *Bagley*, petitioner has not shown that, had it been disclosed, there is a reasonable probability that the result of proceeding would have been different. *See United States v. Zuno-Arce*, 339 F.3d 886, 890-91 (9th Cir. 2003).  As discussed above, when rejecting petitioner's confrontation claim the California Court of Appeal found that Hildreth's testimony did provide important corroboration of Washington's testimony, but concluded that it was not critical to the prosecution's case because Washington identified petitioner as his assailant, and that identification was also partially corroborated by Joseph Tupou's description of the assailant as a black man with braids.  This court similarly concludes from its independent review of the record that while Hildreth's testimony undoubtedly bolstered Washington's, even without her corroboration Washington's identification of petitioner was strong, Tupou's description lent further corroboration to the identification, petitioner's attempts to discredit Washington's identification were unsuccessful, and the jury could have placed more credence in the testimony of these witnesses than in the testimony of petitioner and his alibi witnesses.

The court finds that the state court's rejection of this claim was not contrary to or an unreasonable application of clearly established federal law.  28 U.S.C. § 2254(d)(2). Accordingly, this claim for habeas corpus relief is denied.

C.     *Ineffective Assistance of Counsel*

Petitioner claims that his trial counsel provided ineffective assistance by failing to

15

1  conduct an investigation into the agency reports which would have allowed him to
2  challenge the prosecution's assertion of due diligence, and by failing to object to statements
3  made by the prosecutor during closing argument.

4        *1.     Applicable Federal Law*

5        A claim of ineffective assistance of counsel is cognizable as a claim of denial of the
6  Sixth Amendment right to counsel, which guarantees not only assistance, but effective
7  assistance of counsel.  *Strickland v. Washington*, 466 U.S. 668, 686 (1984).   The
8  benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so
9  undermined the proper functioning of the adversarial process that the trial cannot be relied
10 upon as having produced a just result.  *Id.* at 686.

11       In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, a
12 petitioner must make two separate showings.  First, he must establish that counsel's
13 performance was deficient, that is, that it fell below an "objective standard of
14 reasonableness" under prevailing professional norms.  *Id.* at 687-88.  Judicial scrutiny of
15 counsel's performance must be highly deferential, and a court must indulge a strong
16 presumption that counsel's conduct falls within the wide range of reasonable professional
17 assistance.  *Id.* at 689.

18       Second, the petitioner must establish that he was prejudiced by counsel's deficient
19 performance, that is, that "there is a reasonable probability that, but for counsel's
20 unprofessional errors, the result of the proceeding would have been different."  *Strickland,*
21 466 U.S. at 694.  Where the petitioner is challenging his conviction, the appropriate
22 question is "'whether there is a reasonable probability that, absent the errors, the factfinder
23 would have had a reasonable doubt respecting guilt.'"  *Luna v. Cambra*, 306 F.3d 954, 961
24 (9th Cir. 2002) (quoting *Strickland*, 466 U.S. at 695).

25       The *Strickland* framework for analyzing ineffective assistance of counsel claims is
26 considered to be "clearly established Federal law, as determined by the Supreme Court of
27 the United States" for the purposes of 28 U.S.C. § 2254(d) analysis.  *See Williams*, 529
28 U.S. at 404-08.

**United States District Court**
For the Northern District of California

United States District Court

For the Northern District of California

2.    *Analysis*

     a.    *Failure to Investigate*

Petitioner claims that trial counsel rendered ineffective assistance by failing to discover and investigate the documents about the condemnation of the property where the shooting occurred, which would have enabled him to challenge the prosecution's assertions at the due diligence hearing regarding its efforts to locate Hildreth.

Petitioner raised this claim for the first time in his state habeas corpus petition.  He argued that his trial counsel, who knew well before trial that the property had been boarded up, should have pursued further investigation into the reasons why, in anticipation of petitioner's testimony at trial that the property was a drug house, and that Washington had a motive to frame petitioner for the shooting because petitioner had cut off Washington's drug supply.  Petitioner argued that reasonably competent counsel would have investigated whether the property had been boarded up due to illegal drug activity in order to bolster petitioner's defense, and possibly to find the real shooter.  He claimed that in so doing, counsel would have discovered that the prosecution had not acted with due diligence in attempting to secure Hildreth's presence at trial.

In support of his state petition, petitioner attached a declaration from his trial counsel, Robert Shipway, in which Shipway described his pretrial investigation efforts:

> Within a few days of October 7, 1999, I learned through my investigator that 1373 East 32nd Street was found to be vacant and boarded up.  This was the location of the charged shooting and the last known residence of the two complaining witnesses, Orion Washington and Joseph Tupou, and of eyewitness Bahati Hildreth.  A neighbor informed my investigator that the home was taken over by the city about a month earlier.  I did not further investigate the reason for the house's closure.  I did not refrain from doing so for any tactical reason.  Instead, I focused on establishing Mr. Gaines's alibi defense and locating possible eyewitnesses.
>
> Going into trial, I expected that Mr. Gaines and his witnesses would testify to his having been in Reno at the time of the shooting.  Mr. Gaines would also testify to possible motives of the complaining witness, Orion Washington, to frame him.  Mr. Gaines told me that he thought Washington had falsely accused him because (1) Gaines supplied Washington with marijuana to sell until about one month before the shooting when Gaines had cut off Washington's drug supply; (2) Washington wanted to protect the identity of the true culprits, who were probably involved in other drug dealing with Washington, as 1373 East 32nd Street was a drug house;

United States District Court

For the Northern District of California

1   (3)  Washington's girlfriend was interested in Gaines sexually; and
2   (4) Washington was jealous of Gaines because Gaines had money and
    drugs.

3   Ex. F (attachment A at 3-4).  The state courts summarily denied petitioner's claim.

4        The court finds that petitioner has failed to show either that counsel's performance

5   was deficient or that he was prejudiced thereby.  A defense attorney has a general duty to

6   make reasonable investigations or to make a reasonable decision that makes particular

7   investigations unnecessary.  *See Strickland*, 466 U.S. at 691.  "[A] particular decision not to

8   investigate must be directly assessed for reasonableness in all the circumstances, applying

9   a heavy measure of deference to counsel's judgments."  *Id.*  Even when an attorney recalls

10  no tactical reason for failing to pursue a particular course of investigation, this does not

11  rebut the presumption that he acted reasonably.  *See Alcala v. Woodford*, 334 F.3d 862,

12  870-71 (9th Cir. 2003).

13       Although Shipway declares that there was no tactical reason for his decision to

14  refrain from investigating the closure of the residence, he also states that he instead chose

15  to focus on establishing petitioner's alibi defense and locating possible eyewitnesses.  As

16  noted by respondent, this was a reasonable tactical choice, because Shipway was able to

17  secure two alibi witnesses who testified on petitioner's behalf at trial regarding his presence

18  in Reno at the time of the shooting.  Counsel could have reasonably concluded that it was a

19  better use of his time and resources to pursue evidence that could exculpate petitioner,

20  rather than dedicate resources to investigating the whereabouts of a corroborating

21  prosecution witness.  Moreover, even if counsel's decision was not reasonable, there is no

22  reasonable probability that, but for counsel's unprofessional errors, the result of the

23  proceeding would have been different.  This is because, as discussed in detail above, the

24  admission of Hildreth's preliminary hearing testimony at trial did not undermine confidence

25  in the jury's determination of guilt.

26       The state court's rejection of this claim was not contrary to or an unreasonable

27  application of *Strickland*.  28 U.S.C. § 2254(d)(1).  Accordingly, this claim for habeas

28  corpus relief is denied.

United States District Court

For the Northern District of California

1

            *b.*     *Failure to Object During Closing Argument*

2

      Petitioner claims that trial counsel rendered ineffective assistance because he failed

3

to object when the prosecutor, during rebuttal closing argument, mischaracterized the

4

evidence.  The California Court of Appeal summarized the underlying facts as follows:

5

6

7

8

9

10

        . . . In addition to the alibi, the defense theory was that Orion Washington falsely accused appellant of being his assailant, in retaliation for appellant's decision to cut off drug supplies, and that Washington was protecting the identity of the real shooter.  In support of this theory, appellant's counsel argued that the "most telling" piece of evidence was that Washington testified that he told a social services worker at the hospital that he personally saw the shooter, or a person who looked like him in the hospital, yet he did not report the sighting to Oakland police.  Defense counsel relied heavily on this omission as evidence that Washington was concealing the identity of the actual shooter.

        Washington had also testified that his girlfriend and godsister reported that they had seen a friend of appellant's at the hospital, and their reported sighting had provoked concern for his safety.  In rebuttal, the prosecutor argued that the fact that he didn't call the Oakland police did not impeach Washington, because "[i]t's not clear that he saw the person or that he's recounting what his sister might have seen."

11

12

13

14

Ex. C at 12-13.

15

      On appeal, petitioner argued that his trial counsel should have objected to the

16

rebuttal argument because the prosecutor incorrectly implied that Washington had merely

17

heard from his sister that the shooter was present, yet Washington also testified that he

18

personally saw the shooter.

19

      The court of appeal found that petitioner failed to satisfy either prong of an

20

ineffective assistance of counsel claim:

21

22

23

24

25

26

27

28

        First, the failure to object to the prosecutor's argument did not fall outside the range of reasonable competence.  The court, and the parties, had repeatedly reminded the jury that the statements of attorneys are not evidence, and the court reiterated this basic admonition in its instructions to the jury.  Disagreements about the state of the evidence are common in closing argument, and had counsel objected, the most he could have hoped for, was that the court would again remind the jury that statements of counsel are not evidence.  Counsel therefore could reasonably have concluded that an objection was unnecessary because the record would speak for itself.  Defense counsel had carefully elicited Washington's testimony that he personally saw the shooter, and had distinguished this testimony from Washington's testimony that he had heard from his sister that she had seen the shooter, or shooter's friend, and had exhaustively addressed this point in closing argument.  Although it is true that the failure to object and request an admonition waives a claim of prosecutorial misconduct on appeal, (*see*

19

United States District Court

For the Northern District of California

*People v. Hill* (1998) 17 Cal.4th 800, 820-821) counsel is not required to make every conceivable objection without regard to the likelihood that the misconduct will result in prejudice.  Competent trial counsel often exercise judgment not to object to argument that is technically objectionable because of competing strategic considerations, such as avoiding alienating the jury, creating an impression that the defendant has something to fear from open debate, or highlighting an argument that the jury might otherwise not focus on.  In counsel's judgment, anyone [sic] of these considerations may  have outweighed the potential of an objection, especially in light of the fact that counsel had carefully created the record regarding Washington's testimony that he personally saw his assailant in the hospital, and that the jury would in any event be reminded in the instructions that attorney's statements are not evidence.  It is axiomatic that we must deny a claim of incompetence where, as here, counsel's omission may be explained by the exercise of reasonable judgment, and the weighing of strategic considerations.  (*See People v. Mitcham* (1992) 1 Cal.4th 1027, 1058.)

Second, for the same reasons that counsel may have elected not to object, it is not reasonably probable that the result would have been more favorable to appellant had the objection been made.  The probable result of the objection would have been that the court would admonish the jury that the attorneys' statements are not evidence, and that it should review the record itself.  Even in the absence of an objection the jury had already been informed of this principle, and the court repeated it in its instructions to the jury. We, of course, must assume that the jury followed the court's instructions.  Nor are we persuaded that it is likely that, in the absence of an objection, the jury would have been seriously misled by the prosecutor's argument, because defense counsel carefully brought out the point in cross-examination and argued it extensively to the jury.

Ex. C at 13-14.

The right to effective assistance extends to closing arguments.  *Yarborough v. Gentry*, 540 U.S. 1, 5 (2003).  Nonetheless, counsel has wide latitude in deciding how best to represent a client, and deference to counsel's tactical decisions in his closing presentation is particularly important because of the broad range of legitimate defense strategy at that stage.  *Id.* at 5-6.  Closing arguments should "sharpen and clarify the issues for resolution by the trier of fact," but which issues to sharpen and how best to clarify them are questions with many reasonable answers.  *Id.* (internal quotation marks and citation omitted).  "Judicial review of a defense attorney's summation is therefore highly deferential – and doubly deferential when it is conducted through the lens of federal habeas."  *Id.*

Here, for the reasons detailed by the state court of appeal, the failure to raise an objection to argument reasonably based on the evidence, and made solely in rebuttal to defense counsel's closing argument, was not objectively unreasonable.  Moreover, even if

United States District Court

For the Northern District of California

1 counsel had objected, it is not reasonably probable that a result more favorable to petitioner

2 would have occurred.  In light of defense counsel's extensive cross-examination of

3 Washington, which clearly presented the defense theory that Washington's failure to report

4 seeing his assailant at the hospital showed he was shot by someone else, there is no

5 reasonable possibility that the jury was misled or confused by the prosecutor's statements.

6       The state court's rejection of petitioner's claim was not contrary to or an

7 unreasonable application of *Strickland.*  28 U.S.C. § 2254(d)(1).  Accordingly, this claim for

8 habeas corpus relief is denied.

9 D.    *Instructional Error*

10       Petitioner objects to instructions read to the jury by the trial court regarding Hildreth's

11 preliminary hearing testimony and a defendant's attempts to suppress evidence.

12       *1.    Applicable Federal Law*

13       A challenge to a jury instruction solely as an error under state law does not state a

14 claim cognizable in federal habeas corpus proceedings.  *See Estelle v. McGuire*, 502 U.S.

15 62, 71-72 (1991).  To obtain federal collateral relief for errors in the jury charge, a petitioner

16 must show that the ailing instruction by itself so infected the entire trial that the resulting

17 conviction violates due process.  *See id.* at 72; *see also Cupp v. Naughten*, 414 U.S. 141,

18 146 (1973) ("[I]t must be established not merely that the instruction is undesirable,

19 erroneous or even 'universally condemned,' but that it violated some right that was

20 guaranteed to the defendant by the Fourteenth Amendment.").  The instruction may not be

21 judged in artificial isolation, but must be considered in the context of the instructions as a

22 whole and the trial record.  *See Estelle*, 502 U.S. at 72.  In other words, the court must

23 evaluate jury instructions in the context of the overall charge to the jury as a component of

24 the entire trial process.  *United States v. Frady*, 456 U.S. 152, 169 (1982).

25       *2.    Analysis*

26             *a.    Instruction Regarding Hildreth's Testimony*

27       The trial court instructed the jury with CALJIC No. 2.12, which provides:

28             Testimony given by a witness at a prior proceeding who was

21

United States District Court

For the Northern District of California

1    unavailable at this trial has been read to you from the reporter's transcript of
2    that proceeding.  You must consider that testimony as if it had been given
     before you in this trial.

3    RT 440; CT 219.

4        On appeal, petitioner argued that the instruction invaded the province of the jury to

5    assess the credibility of witnesses, by requiring the jury to disregard the fact that it could

6    not assess Hildreth's demeanor and attitude, because she did not appear before them.

7    The court of appeal rejected petitioner's argument on the following grounds:

8            The language of CALJIC No. 2.12 derives from Evidence Code section
9        1291 which provides that testimony of an unavailable witness is subject to the
         same objections and limitations "as though the declarant were testifying at the
10       hearing. . . ."  Read in context with the other instructions given we find no
         "reasonable likelihood" that the jury would have misinterpreted CALJIC No.
11       2.12, to mean that it must disregard the fact that it had no opportunity to
         observe Hildreth's demeanor and attitude in assessing her credibility and
12       weighing her testimony.  (See *Estelle v. McGuire* (1991) 502 U.S. 62, 72;
         *People v. Kelly* (1992) 1 Cal.4th 495, 525-527.)  The court gave CALJIC No.
13       2.12 immediately before it gave a series of other standard instructions
         informing the jury of relevant factors in assessing the weight and credibility of
14       witnesses.  Thus, when read together with these instructions, the jury would
         have properly understood CALJIC No. 2.12 to mean only that it should apply
15       to Hildreth's testimony all relevant instructions relating to the weight and
         credibility of witness testimony "as if it had been given before [it] in this trial."
16       Moreover, defense counsel argued to the jury at length, and without objection,
         regarding the application of the factors set forth in CALJIC No. 2.20
17       [Believability of Witness] to Hildreth's testimony, and specifically invited the
         jury to accord Hildreth's testimony less weight because of their inability to
18       assess her demeanor and attitude.

19   Ex. C at 9-10.   The court concluded that "the instruction in this case simply told the jury to

20   subject Hildreth's testimony to the same credibility factors it applied to in-court testimony."

21   *Id.* at 10.

22       In *Cupp v. Naughten*, 414 U.S. at 142, the Supreme Court rejected a challenge to a

23   state instruction which told the jury that each witness was presumed to testify truthfully and

24   explained how the presumption might be overcome, because the instruction did not violate

25   "some right . . . guaranteed to the defendant by the Fourteenth Amendment."  Relying on

26   *Cupp,* the Ninth Circuit found no constitutional problem with CALJIC No. 2.20.1, which

27   instructs a jury not to reject a child's testimony solely because of his age, because the

28   instruction "merely prevents disregard of a child's testimony, but does not amplify [it]."

United States District Court

For the Northern District of California

1   *Brodit v. Cambra,* 350 F.3d 985, 990-91 (9th Cir. 2003).  Similarly, in the present case, the

2   challenged portion of CALJIC No. 2.12 prevents disregard of a witness's prior testimony

3   solely because the witness did not testify at trial in person, but "does not amplify" the prior

4   testimony or factors to be used when evaluating credibility.  Further, in light of the

5   instructions given to the jury as a whole and counsel's arguments, there is no reasonable

6   likelihood that the jury misinterpreted the instruction to mean that it must disregard the fact

7   that it had no opportunity to observe Hildreth's demeanor and attitude in assessing her

8   credibility and weighing her testimony.

9       The state court's rejection of this claim was not contrary to or an unreasonable

10  application of clearly established federal law.  28 U.S.C. § 2254(d)(1).  Accordingly, this

11  claim for habeas corpus relief is denied.

12           *b.    Cautionary Instruction*

13      After closing arguments but before the trial court instructed the jury, the prosecutor

14  asked that the jury be read an instruction regarding a defendant's attempt to suppress

15  evidence.  The request was based on the fact that, when the prosecutor asked petitioner to

16  smile for the jury, he lacked gold caps on his teeth, even though he had worn them during

17  jury selection.  At trial, witness testimony identified petitioner as having distinctive gold

18  capped teeth.  Over defense counsel's objection, the court instructed the jury with CALJIC

19  No. 2.06, which provides:

20           If you find that a defendant has attempted to suppress evidence
         against himself in any manner, such as concealing evidence, this attempt
21       may be considered by you as a circumstance tending to show a
         consciousness of guilt.  However, this conduct is not sufficient by itself to
22       prove guilt, and its weight and significance, if any, are for you to decide.

23  RT 440; CT 217.

24      On appeal, petitioner argued that the instruction should not have been given

25  because there was no evidence to support an inference that he had attempted to conceal

26  any evidence against him, and the instruction was prejudicial.  The court of appeal rejected

27  petitioner's argument as follows:

28           The record, however, supports the trial court's determination that there

United States District Court

For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

was evidence to support giving this instruction.  At least one prosecution witness described appellant as wearing gold caps on his incisors.  However, when the prosecutor asked appellant to smile for the jury, he was not wearing gold caps.  It was later stipulated that appellant, "does in fact have a set of gold caps that he wears over his front teeth.  That he has those in his possession.  He's worn them as recently as jury selection in this case." Appellant also testified that he was wearing his gold teeth in April and May 1999, and when he was arrested in Reno, but that they had been "knocked out" in jail, about a month prior to his testimony.  In overruling appellant's objection to this instruction, the court reasoned: "There was . . . testimony from the witnesses concerning some gold teeth and there was [appellant] standing up with no gold teeth.  So the jury can see that, they can take it for whatever reason, but the court will give it.  I think fortunately he had a chance to explain it . . .

Appellant argues that, by stipulating that he did wear gold teeth at the time of the offense, and admitting this fact in his own testimony, he precluded any possible inference that he had attempted to conceal evidence against him by not wearing the gold caps at the trial.  The stipulation, however, merely established the fact that appellant did have gold caps, and that he had worn them at the time of the offense and during jury selection.  It did not, however, conclusively establish any facts regarding the reason he was not wearing them when the prosecution asked him to smile for the jury during its case-in-chief.  Conflicting inferences could be drawn from the evidence: If the jury credited appellant's testimony that the teeth had been knocked out, it could find that he had not attempted to conceal evidence.  Even if it did not credit this explanation, it could nevertheless conclude that it was merely coincidental that appellant was not wearing the caps at trial, and draw no inference of consciousness of guilt.  Alternatively, if it did not credit appellant's explanation, it could have inferred that appellant had removed the caps, in the hope of raising some doubts in the jury's mind that he was the shooter.  The stipulation that he did possess gold caps, was not irreconcilable with the conclusion that he had attempted to conceal evidence, because the jury might also have reasoned that appellant abandoned his effort, when it appeared that only negative inferences might be drawn from an attempt to conceal this fact, or because the fact that he wore gold caps could be established by other evidence.  We conclude that, irrespective of its weight, there was substantial evidence to support the inference that appellant had attempted to conceal the fact that he wore gold teeth, and the court therefore did not err in giving CALJIC No. 2.06.[5]

Ex. C at 11-12.

The Due Process Clause of the Fourteenth Amendment protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he or she is charged.  *In re Winship*, 397 U.S. 358, 364 (1970).  Whether an instruction that creates an evidentiary inference violates due process

---

[5]   We also note that, in closing arguments, the prosecution did not rely on CALJIC 2.06, and did not argue that appellant had attempted to conceal the fact that he wore gold teeth.

**United States District Court**
For the Northern District of California

1  by relieving the state of its burden of proving each element of a crime beyond a reasonable

2  doubt depends upon whether the instruction creates a mandatory presumption or a

3  permissive inference.  *See Francis v. Franklin*, 471 U.S. 307, 314 (1985).  A mandatory

4  presumption instructs the jury that it must infer the presumed fact if the state proves certain

5  predicate facts.  *Id.*  A permissive inference suggests to the jury a possible conclusion to be

6  drawn if the state proves predicate facts, but does not require the jury to draw that

7  conclusion.  *Id.*  A permissive inference does not relieve the state of its burden of

8  persuasion because it still requires the state to convince the jury that the suggested

9  conclusion should be inferred based on the predicate facts proved.  *Id.*  A permissive

10  inference violates the Due Process Clause only if the suggested conclusion is not one that

11  reason and common sense justify in light of the proven facts before the jury.  *Id.* at 314-15

12  (citing *Ulster County Court v. Allen*, 442 U.S. 140, 157-163, (1979)).

13       The trial court's CALJIC No. 2.06 instruction to the jury, directing its attention to

14  specific items of evidence from which an inference of guilt could be drawn, was not

15  constitutional error.  First, as found by the California Court of Appeal, the instruction was

16  supported by the evidence.  And, because the inference suggested by the instruction was

17  permissive and not mandatory, the instruction did not improperly shift the state's burden of

18  proof.  Moreover, even if the instruction was given erroneously, petitioner has not shown

19  that the instruction by itself so infected the entire trial that the resulting conviction violates

20  due process.  Washington's eyewitness identification of petitioner as his assailant did not

21  rely solely or heavily upon the fact that petitioner wore gold teeth, and Joseph Tupou's

22  corroborating testimony did not rely upon that fact at all.  The record does not support a

23  finding that the permissive inference had any effect on the verdict.

24       The state court's rejection of this claim was not contrary to or an unreasonable

25  application of clearly established federal law, 28 U.S.C. § 2254(d)(1), nor was it based on

26  an unreasonable determination of the facts in light of the evidence presented at trial, *id.*

27  § 2254(d)(2).  Accordingly, this claim for habeas corpus relief is denied.

28                                          **CONCLUSION**

                                              25

1          For the foregoing reasons, the petition for a writ of habeas corpus is DENIED.

2    Petitioner's motion for entry of default judgment is also DENIED.  (Docket no. 17.)

3          The clerk of the court shall enter judgment and close the file.

4          **IT IS SO ORDERED.**

5

Dated: 2/26/07                                    _____

6                                          PHYLLIS J. HAMILTON
                                          United States District Judge

7

8

9    G:\PRO-SE\PJH\HC.03\Gaines1268.DenyHC.ECK

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California